IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 2, 2016

**IN RE DESTINY S.**

**Appeal from the Juvenile Court for Putnam County**
**No. 15JT7    John P. Hudson, Judge**

_____

**No. M2016-00098-COA-R3-PT – Filed August 4, 2016**

_____

This appeal involves the termination of a mother's parental rights to her minor child. Following a bench trial, the trial court found that clear and convincing evidence existed to support termination on the statutory grounds of substantial noncompliance with a permanency plan, persistent conditions, and severe child abuse. The court further found by clear and convincing evidence that termination was in the child's best interest. The mother appeals. Having reviewed the record, we hold that only the ground of substantial noncompliance with a permanency plan is supported by clear and convincing evidence. Additionally, we hold that clear and convincing evidence supports the trial court's finding that termination is in the child's best interest. Because the record contains clear and convincing evidence to support one statutory ground for termination and that termination is in the child's best interest, we affirm the trial court's termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Seth Crabtree, Cookeville, Tennessee, for the appellant, Jennifer D.

Herbert H. Slatery, III, Attorney General and Reporter; Madeline B. Brough, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

# OPINION

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Jennifer D. ("Mother") is the biological mother of Navada D. (born in December 2007) and Destiny S. (born in January 2010). Navada and Destiny have different biological fathers, both of whom were largely absent during the early stages of the children's lives. Destiny is the only child at issue in this appeal.

On April 16, 2013, Mother was pulled over by a state trooper who witnessed her driving erratically on Interstate 40. The trooper observed that Destiny was unrestrained in the car's back seat without an appropriate booster seat. The trooper observed that Mother's eyes were watering and administered five standardized field sobriety tests. Mother failed two of the field sobriety tests and, although she denied having consumed any medication, admitted to having Xanax and morphine pills in her possession. The trooper placed Mother under arrest and transported her to a medical center where she tested positive for Xanax. Mother was charged with DUI and reckless endangerment as a result of the incident. She later pled guilty to those charges and was sentenced to 11 months and 29 days of supervised probation.

Several days later, the Tennessee Department of Children's Services ("DCS") received a report detailing the circumstances of Mother's arrest and arranged a meeting with Mother to discuss the incident. During the meeting, Mother admitted to having taken Xanax and morphine prior to her arrest and stated that she had been struggling with addiction to pain medication since being diagnosed with degenerative disc disease at age 14. She explained that she was often prescribed pain medication in the years that followed but had been purchasing pain pills off the street at times when she could not get them legally. Following the meeting, DCS opted against taking court action if Mother would enter a drug treatment program.

Mother completed drug treatment programs in May and June 2013 but relapsed shortly thereafter. In August 2013, DCS filed a petition to have Destiny and Navada adjudicated dependent and neglect in the Putnam County Juvenile Court. In the petition, DCS requested that the court determine whether the circumstances of Mother's arrest constituted severe child abuse but asserted that the children's best interests would be served by remaining in Mother's home so long as she complied with a stringent protective supervision plan. In September 2013, the court entered an order adjudicating the children dependent and neglected upon Mother's stipulation. The court did not make a finding of severe child abuse and ordered that the children remain in Mother's custody under the protective supervision of DCS. The court also outlined a protective supervision plan requiring Mother to cooperate

and maintain regular contact with DCS workers, maintain a lifestyle free of substance abuse, submit to random drug screens and home visits, and complete an alcohol and drug assessment.

Mother agreed to the court's protective supervision plan, and the children continued to reside with her in the home of their maternal grandmother, who had been diagnosed with cancer and was in very poor health. Mother completed intensive outpatient program treatment in October 2013 but relapsed once again as her mother's health deteriorated. On January 17, 2014, Mother tested positive for oxycodone. The following week, she missed a hair follicle drug screen and a probation meeting, opting instead to remain in the hospital with her mother, who was in the final stages of her battle with cancer.[1] The missed probation meeting resulted in Mother's arrest on February 9, 2014. Mother tested positive for THC and suboxone while she was incarcerated and tested positive for opiates shortly after her release. Mother claimed that she had a valid prescription for hydrocodone but did not provide proof of the prescription to DCS.

On March 7, 2014, DCS received a report alleging that Mother was abusing marijuana and pain pills, that she attempted to circumvent drug screens by using the children's urine, and that the children often went without food. Thereafter, DCS made several attempts to meet with Mother, but Mother reported that she was out of town and the children were with a babysitter. DCS caseworker Felecia Winningham finally met with Mother and the children at their home on March 18, 2014. Shortly thereafter, DCS filed a motion seeking temporary custody of the children.

On March 27, 2014, the trial court entered an order on DCS's motion for temporary custody. The court found that Mother's home was cluttered to the point that Ms. Winningham was unable to walk into the bedrooms during her visit. Navada was at home during the visit although it was a school day and he stated that he was not sick. When Ms. Winningham asked to speak to Navada in his bedroom, he began to cry and told her that he had been instructed not to allow her in there. Ms. Winningham asked Navada whether he had ever provided urine samples for Mother, and he admitted that he had done so on five occasions. Ms. Winningham administered a urine drug screen to Mother, who tested positive for suboxone although she denied having used the drug. The court also found that DCS had received reports of the children going to school hungry and without weather-appropriate clothing, and that the schools sent clothes and food home with the children on several occasions. Based on its findings, the court granted DCS's motion for temporary custody of Navada and Destiny, and both children were placed in foster care.

---

[1] Mother testified that her mother passed away on January 26, 2014.

Shortly after the children's removal, DCS met with Mother to discuss the steps she would need to take to regain custody. On May 6, 2014, Mother participated in the development of a permanency plan with the goal of reunification. Although the initial permanency plan did not contain a statement of responsibilities section, the testimony at trial was consistent that Mother's primary obligations were to secure safe and stable housing, maintain a legal income, complete an alcohol and drug assessment, and complete a psychological assessment and follow recommendations.

In October 2014, Mother suffered a severe work-related injury to her arm. Despite Mother's history of addiction, it was immediately clear to the parties that Mother might require prescription medication to manage pain associated with the injury. On October 28, 2014, DCS met with Mother to develop a new permanency plan with requirements aimed at balancing Mother's need for pain medication following her injury with her history of substance abuse. The new permanency plan also added the dual goal of adoption for Destiny and addressed concerns regarding Mother's mental health and lack of suitable housing.[2] With regard to substance abuse, the plan required Mother to provide DCS with affidavits from her treating physician stating the physician's knowledge of Mother's history of addiction and stating the necessity of any prescribed narcotic drugs, complete an alcohol and drug assessment to assess her potential for relapse, refrain from associating with drug users, participate in parenting services, take medication only as prescribed, report any changes in prescribed medications to DCS within three days and provide documentation from the pharmacy in which the prescription was filled, make prescriptions available for random pill counts, and submit to urine and hair follicle drug screens. With regard to mental health, the plan required Mother to sign releases of information to allow open communication between providers and DCS, attend scheduled appointments with a mental health provider, and complete a psychological assessment. Finally, with regard to housing, the plan required Mother to secure safe and stable housing, maintain a legal means of support, allow monthly home visits, and demonstrate an ability to make monthly utility and rent payments.

In the meantime, Navada's biological father began to play an increased role in his life. Their relationship developed to the point that Navada was removed from foster care to begin a 90-day trial home visit with his father in March 2015. At the end of the trial home visit, the trial court transferred custody of Navada to his father. Destiny, whose father was incarcerated in Ohio at all times relevant to this case, remained in foster care.

---

[2] Although Mother was living with her boyfriend and his family at the time, she represented to DCS caseworkers that the children would not live there if they were returned to her.

On May 15, 2015, DCS filed a petition to terminate Mother's parental rights to Destiny.[3] The petition alleged that termination of Mother's parental rights was supported on four statutory grounds. First, it alleged that Mother abandoned Destiny by willfully failing to support her. Second, it alleged that Mother was in substantial noncompliance with her permanency plan. Third, it alleged that the conditions that led to Destiny's removal, i.e., Mother's substance abuse and inability to provide a suitable home, still persisted and were unlikely to be remedied at an early date. Fourth, it alleged that Mother severely abused Destiny by driving under the influence of intoxicants with Destiny unrestrained in the car. Additionally, the petition alleged that terminating Mother's parental rights would be in Destiny's best interest.

The trial court conducted a hearing on the termination petition on October 6, 2015, and the following evidence was presented. At the time of the hearing, Mother had been living in a two-bedroom apartment for approximately a month. However, she did not have a lease on the apartment and only lived there on a month-to-month basis. She had been exercising monthly in-person visitation and bi-weekly phone visitation with Destiny. She was working part-time in a staffing office and attending physical therapy three days a week for her arm. Since her injury, Mother had undergone three surgeries to insert metal plates into her arm. Despite being prescribed pain medication after each surgery, she had not provided pharmacy records, made her medication available for a pill count, or submitted an affidavit from her treating physician. She had not submitted to a urine drug screen in over a year and had only submitted to one hair follicle drug screen in which she tested positive for prescribed medication. She had completed a psychological assessment but had not completed an alcohol and drug assessment or attended parenting classes.

Karen Seals was a team coordinator for Omni Community Health, a private foster care agency with whom DCS had contracted for services. She testified that although four DCS caseworkers had been assigned to Mother throughout the case, she had been involved with the case in a supervisory capacity since the time Destiny was placed in foster care. Ms. Seals met with Mother for the first time in April 2014 to discuss the reasons the children had been removed from her custody. Mother did not express any misunderstanding regarding the steps she needed to take to regain custody of the children. She also knew that noncompliance with her permanency plans could lead to termination of her parental rights. To Ms. Seals's knowledge, the psychological assessment was the only permanency requirement Mother had fulfilled. Although she admitted that caseworkers could have done more to get Mother alcohol and drug treatment, Ms. Seals denied having represented Mother could not complete

---

[3] The petition also sought to terminate the parental rights of Destiny's biological father, Robert S. Robert S. voluntarily surrendered his parental rights to Destiny prior to the termination hearing in this case and is not a party on appeal.

an alcohol and drug assessment while she was prescribed medication for her arm. She testified that caseworkers had difficulty locating Mother and getting her to submit to urine drug screens. On one occasion, Mother stated that her attorney advised her against taking a urine drug screen.

DCS team leader Mary Gabbert testified that she had been assigned to the case shortly after the termination petition was filed and discussed Mother's permanency requirements with her on two occasions. She offered to help Mother in completing the permanency requirements, but Mother never took advantage of it. When Ms. Gabbert questioned Mother about completing an alcohol and drug assessment, Mother insisted that she would do it when she came off her prescribed medication. During a three-hour visitation in May 2015, Ms. Gabbert attempted to administer a urine drug screen, but Mother claimed she could not go to the bathroom. Ms. Gabbert testified that Mother did not allow DCS caseworkers to visit her home for the majority of the case. DCS verified Mother's apartment and received proof of utility and rent payments less than a week before the termination hearing. Ms. Gabbert stated that Mother had not resolved the issues that caused Destiny to be placed in foster care and it would not be safe to return Destiny to her care at that time.

Sumner Deason was Mother's DCS caseworker from May 2015 through the termination hearing. Ms. Deason testified that she made offers to help Mother with her permanency requirements, but Mother "shrugged them off." Mother refused four urine drug screens in 2015 and insisted on waiting to get off prescribed medication before she would complete an alcohol and drug assessment. Prior to in-person visitations, Ms. Deason asked Mother to provide her medication for pill counts, but Mother claimed to forget each time. She also provided Mother with an affidavit to have signed by her physician, and Mother never returned it. Although Mother's apartment at the time of the hearing was appropriate, Ms. Deason was unable to assess the suitability of Mother's home until five days prior to the termination hearing. Prior to that time, Mother would not tell Ms. Deason where she was living and stated only that she was living with her aunts off and on. Ms. Deason acknowledged that she could have done more to assist Mother in completing the permanency requirements but added that she would have been willing to provide additional services if Mother had met her halfway. Mother did not appear to be interested in taking advantage of help and did not appear to care until the months immediately preceding the termination hearing.

Destiny's foster mother testified that Destiny had been living with her family since coming into foster care in March 2014. When Destiny came into foster care, she was unpredictable, had not been potty trained, and had severe visual problems. Since that time, Destiny has been doing very well in her home and developed a strong bond with her foster family. Destiny's foster parents took her to the eye doctor, and she eventually had eye

surgery to correct her vision. Her foster mother testified that DCS initially set up phone visitation between Mother and Destiny twice a week at 4:00 p.m., but the calls had been moved to 3:45 p.m. so that Destiny could attend karate practice. She stated that Mother only participated in approximately 50% of the calls, and Destiny was largely indifferent to them. She testified that she considered Destiny a member of her family, and they intended to adopt her if Mother's parental rights were terminated.

Mother testified that her drug use was the primary reason the children were removed from her custody. She was "doing very badly" around the time that her mother died, and she agreed that remaining in her care was not in the children's best interest at that time. She insisted, however, that it was not in Destiny's best interest to be permanently removed from her care. She explained that she had recently moved into a suitable two-bedroom apartment and had been drug-free since coming off prescription medication for her arm surgery three weeks earlier. Nevertheless, Mother testified on cross-examination that she had been to the emergency room "forty or fifty times" in 2015, and that most of those visits were for kidney stones for which she was often prescribed pain medication.

Regarding her permanency plan requirements, Mother completed a psychological assessment in April 2015 and started attending mental health counseling several months prior to the termination hearing. Mother acknowledged the importance of completing an alcohol and drug assessment but insisted that she thought she could not complete an assessment while on prescribed medication. She testified that her failure to submit to urine drug screens was the result of difficulty urinating caused by kidney stones and admitted that her attorney had never advised her against it. She explained she had no problems with hair follicle drug screens and pointed out that she had submitted to one in June 2015. She acknowledged that she had not provided pharmacy records or returned the physician's affidavit but testified that she signed a release allowing DCS to access her medical information. Mother stated that she had missed some phone visitations with Destiny because she was not able to call at 3:45 p.m. She contacted Ms. Deason and requested that the calls be moved back to 4:00 p.m.

Evelyn Dyer is Mother's aunt and testified that she reconnected with Mother after running into her at the store several months prior to the termination hearing. Ms. Dyer provides support to Mother by taking her to lunch and driving her to visitations with the child. Ms. Dyer testified that Mother loves the child very much and that she would be willing to help Mother with Destiny in any way she can.

The trial court entered an order terminating Mother's parental rights to Destiny on December 23, 2015. Based on the evidence presented at the termination hearing, the trial court found that DCS established three grounds for terminating Mother's parental rights: (1) substantial noncompliance with a permanency plan, (2) persistent conditions, and (3) severe

- 7 -

child abuse. Additionally, the trial court found that termination of Mother's parental rights was in Destiny's best interest. Mother timely filed a notice of appeal.

## II. ISSUES

Mother raises the following issues on appeal, restated from her appellate brief:

1. Whether the trial court's finding that termination of Mother's parental rights is in Destiny's best interest is supported by clear and convincing evidence.

2. Whether the trial court erred in denying Mother's motion for a continuance to require DCS to respond to her pretrial interrogatories with written answers.

Although Mother does not challenge the grounds relied on by the trial court in terminating her parental rights, the Tennessee Supreme Court has directed this Court to review the record to determine whether there is clear and convincing evidence to support the trial court's findings both with regard to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges those findings on appeal. *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016). We will therefore review the trial court's findings as to each of the three grounds for termination in addition to the issues argued in Mother's brief.

## III. STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993)); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although a parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate parental rights are governed by statute. A party seeking to terminate parental rights must prove two things. First, the party must prove

the existence of at least one of the statutory grounds for termination.[4] Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010). Second, the party must prove that terminating parental rights is in the child's best interests.[5] Tenn. Code Ann. § 36-1-113(c)(2); *In re Angela E.*, 303 S.W.3d at 251. In light of the fundamental rights at stake in a termination proceeding, the grounds for termination and best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d at 653.

In light of the heightened burden of proof in parental termination cases, a reviewing court must modify the customary standard of review set forth in Tennessee Rule of Appellate Procedure 13(d). First, we review the trial court's specific factual findings de novo with a presumption of correctness unless the evidence in the record preponderates otherwise. Tenn. R. App. P. 13(d); *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013). Second, we must determine whether the facts, as found by the lower court or as supported by a preponderance of the evidence, amount to clear and convincing evidence that the elements necessary to terminate parental rights have been established. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Bernard T.*, 319 S.W.3d at 596-97. Whether the facts are sufficient to support termination of parental rights is a conclusion of law, which we review de novo with no presumption of correctness. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citing *In re Valentine*, 79 S.W.3d at 548).

In addition to those issues directly related to the termination of her parental rights, Mother challenges the trial court's ruling on an issue of pretrial discovery. On appeal, we review a trial court's pretrial discovery decisions using an abuse of discretion standard. *West v. Schofield*, 460 S.W.3d 113, 120 (Tenn. 2015). Under the abuse of discretion standard, we only disturb a trial court's ruling if it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Id.*

## IV. GROUNDS FOR TERMINATION

---

[4] The statutory grounds for terminating parental rights are listed in Tennessee Code Annotated section 36-1-113(g). The petitioner needs only to establish the existence of one of the twelve statutory grounds to support an order terminating parental rights when termination is in the best interests of the child. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

[5] The factors to be considered in a "best interests" analysis are listed in Tennessee Code Annotated section 36-1-113(i).

First, we will address the grounds relied on by the trial court in terminating Mother's parental rights. The trial court found that termination of Mother's parental rights was supported on three grounds: (1) substantial noncompliance with a permanency plan, (2) persistent conditions, and (3) severe child abuse. *See* Tenn. Code Ann. § 36-1-113(g)(2), (3), (4). Mother does not challenge any of the grounds on appeal. Nevertheless, as we explained above, this Court must determine whether the record contains evidence sufficient to support the trial court's findings with regard to each ground for termination regardless of whether the parent challenges those findings on appeal. *In re Carrington H.*, 483 S.W.3d at 525-26. We will therefore review the evidence in the record supporting the trial court's findings as to each ground for termination.

### 1. Substantial Noncompliance

The first statutory ground relied on by the trial court to terminate Mother's parental rights was substantial noncompliance with a permanency plan. Before we address the merits of the trial court's findings on this ground, however, we feel it necessary to express several concerns raised by the permanency plans in this case.

Tennessee Code Annotated section 37-2-403 directs DCS to prepare a permanency plan within 30 days of a child's placement in foster care and provides that the court must review, modify, and ratify or approve of the plan within 60 days of the foster care placement. Tenn. Code Ann. § 37-2-403(a)(1)(A), (a)(2)(A). It further provides that the permanency plan for any child in foster care "shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency." Tenn. Code Ann. § 37-2-403(a)(2)(A). Here, the children were placed in foster care on March 27, 2014. The initial permanency plan was developed more than 30 days later on May 6, 2014 and ratified nearly 10 months later on January 22, 2015. More egregiously, however, the initial permanency plan does not include a section labeled as the "statement of responsibilities." In fact, it does not contain any section listing Mother's permanency responsibilities. That omission is not a mere technicality. As we stated in a previous case:

> "[T]he statute that sets out this ground for termination states that parental rights may be terminated where there is substantial noncompliance 'with the *statement of responsibilities*' in the permanency plan." Moreover, the statement of responsibilities serves a substantive purpose. If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities. Thus, the absence of a clearly marked "statement of

responsibilities" for Mother in the permanency plan is a significant problem. It is difficult for the Court to find that Mother failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one.

*In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *13 (Tenn. Ct. App. Sept. 14, 2012) (internal citations omitted); *see also In re Navada N.*, No. M2015-01400-COA-R3-PT, 2016 WL 3090908, at *18 (Tenn. Ct. App. May 23, 2016).

Nevertheless, despite the initial permanency plan's shortcomings, Mother cannot escape the conditions placed on her in this case. The timing requirements of Section 37-2-403 are directory and not mandatory. *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003). Mother's testimony reflects that she was aware of the conditions placed on her from the earliest stages of this case. Moreover, a second permanency plan, developed in October 2014, lists each of Mother's permanency requirements in an appropriately marked "statement of responsibilities" section. Mother does not argue on appeal nor did she testify at trial that she was unaware of her responsibilities under the permanency plan. She was represented by counsel at all pertinent times in this case and has never objected to the continuing applicability of the plans. Accordingly, we will address the merits of this ground for termination.

Parental rights may be terminated for substantial noncompliance with the statement of responsibilities contained in a permanency plan, Tenn. Code Ann. § 36-1-113(g)(2), so long as the plan's requirements are "reasonable and related to remedying the conditions which necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C). As we have emphasized in the past, noncompliance alone is not sufficient to warrant extinguishing the parent-child relationship. *See, e.g.*, *In re M.J.B.*, 140 S.W.3d at 656 ("Terminating parental rights . . . requires more proof than that a parent has not complied with every jot and tittle of the permanency plan."). To warrant termination, the parent's noncompliance must be "substantial." *In re Valentine*, 79 S.W.3d at 548. Substantial noncompliance is measured by both the degree of noncompliance and the weight assigned to the particular requirement. *Id.* "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656-57.[6]

---

[6] In past cases, this Court has stated the additional requirement that DCS must make reasonable efforts to assist the parent in meeting the requirements of the permanency plan. *See, e.g.*, *In re Arteria H.*, 326 S.W.3d 167, 177 (Tenn. Ct. App. 2010). In 2015, however, the Tennessee Supreme Court clarified that Tennessee Code Annotated section 36-1-113 does not require proof of reasonable efforts as a precondition to termination. *In re Kaliyah S.*, 455 S.W. 3d 533, 554 (Tenn. 2015). The court concluded that proof of reasonable efforts should be considered, but not necessarily dispositive, only with regard to abandonment by failure to establish a suitable home and the best interests of the child. *Id.* at 554 n.29, 555.

The trial court made the following findings with regard to substantial noncompliance:

21. The requirements in the permanency plans are all reasonably related to remedying the conditions that necessitate foster care.

22. [Mother] has not completed the following requirements in the permanency plans: she has not provided DCS with an affidavit from the physician [who] prescribes her narcotics stating her need for the narcotics is greater than the risk from addiction; she has not submitted to an A&D assessment since the child has been in custody and has had not submitted to A&D treatment since the child has been in State's custody; she has not provided DCS with pharmacy records to show filled prescriptions; she has not submitted to random pill counts; since at least January 1, 2015 she has refused all urine drug screens; she has not completed parenting training; she has not allowed DCS to visit her home until five days before this trial; and she has not provided DCS with proof of attending her mental health appointments.

23. [Mother] has not substantially complied with the provisions of the permanency plans and therefore her parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

We agree with the trial court's finding that the permanency requirements are reasonable and appropriate. The children were placed in foster care due to Mother's lack of suitable housing and substance abuse. The record reflects that DCS also had concerns at the time regarding Mother's mental health. The permanency requirements are aimed at remedying those conditions. Additionally, the requirements aimed at allowing DCS to closely monitor Mother's use of prescribed medication after her injury are appropriate in light of her past struggles with addiction.

The record reflects that Mother failed to comply at all with many of the permanency plan requirements. Mother failed to take a parenting class. She failed to allow monthly home visits. She failed to return the signed physician's affidavit that DCS provided to her. She failed to make her medication available for pill counts despite being reminded to bring them to visitation. She failed to provide pharmacy records showing filled prescriptions. She refused four urine drug screens in 2015. Although Mother testified that her kidney stones made it difficult to urinate, the record does not reflect that she was unable to urinate in each instance. Ms. Seals testified that on one occasion, Mother claimed that her attorney advised her against it. On cross-examination, Mother admitted that her attorney never gave her that advice. On another occasion, Mother refused a urine drug screen because she said she did not want to do it in a public bathroom. Finally, Mother failed to complete an alcohol and

drug assessment. We note that the record is unclear as to whether Mother's belief that she could not complete an assessment while on prescribed medication was justified. Mother testified that Ms. Seals said she would not be accepted for treatment while she was being prescribed pain medication. Although Ms. Seals denied having made such a statement, Mother's position is bolstered by the trial court's statement in a January 2015 order that, "[Mother] will have to submit to another A&D assessment once she has completed her prescribed medication." Nevertheless, at the time of the hearing, Mother had still not taken any steps towards completing an assessment despite testifying that she had been off prescription medication for three weeks. As such, we are unwilling to hold that she was excused from complying with that permanency requirement.

Given the degree of noncompliance and the weight assigned to the particular requirements, Mother's noncompliance was substantial. The majority of the permanency requirements Mother failed to complete were aimed at addressing her substance abuse issues. Mother's addiction to prescription medication has been a primary concern in this case from the very beginning. It was Mother's arrest after driving under the influence of Xanax and morphine with Destiny unrestrained in the car that precipitated DCS's initial involvement with the family. Mother's trial testimony reflected her understanding of the importance DCS placed on addressing her issues with addiction throughout the case. Obviously, Mother's efforts to overcome those issues became considerably more complicated when she suffered a severe arm injury in October 2014. In our view, however, that added complexity of Mother's injury made her compliance with the permanency requirements all the more important. The permanency plan developed after the injury reflected an understanding that, despite Mother's history of addiction, prescription medication would likely be necessary to help her manage pain associated with the injury and the surgeries that followed. The plan did not prohibit Mother from taking medically necessary prescription pain medication. Rather, it placed requirements on her to ensure that the medications prescribed to her were medically necessary and that she used them in the manner prescribed. Given her past substance abuse issues, it was extremely important that she complied with those requirements. By failing to do so, she left DCS without any verifiable evidence that she was not abusing the medication. In light of Mother's history of addiction and relapse, we cannot excuse her noncompliance with those requirements. Accordingly, we hold that the record contains clear and convincing evidence to support the trial court's finding of substantial noncompliance with Mother's permanency plan.

### 2. Persistent Conditions

The trial court relied on Tennessee Code Annotated section 36-1-113(g)(3) as a ground for terminating Mother's parental rights. This ground for termination, commonly referred to as "persistence of conditions," applies where:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3). The purpose of the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)). It is focused on the results of the parent's efforts at improvement rather than the mere fact that he or she has made them. *In re Audrey S.*, 182 S.W.3d at 874. Thus, a parent's failure to remedy the conditions that led to the child's removal need not be willful. *In re Dakota C.R.*, 404 S.W.3d at 499.

The trial court made the following findings related to the ground of persistent conditions:

24. The child has been removed from the custody of her mother for more than six (6) months.

25. The conditions which led to the removal of the child from the home of [Mother] still exist and other conditions exist which in all probability would cause the child to be subject to further abuse and/or neglect, making it unlikely that the child could be returned to [Mother] in the near future.

26. To date, mother has still not addressed her A&D issues by submitting to an A&D assessment and following the recommendations.

- 14 -

27. There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to [Mother] in the near future.

28. Mother claimed at trial that the reason she had not taken the A&D assessment was because she believed they would not accept her into any treatment program while she was taking prescribed narcotics.

29. Mother testified at trial, however, that she was no longer taking any narcotic medications but has still failed to complete the assessment.

30. The conditions that led to the removal of the child from the home of [Mother] were the mother's lack of a suitable home and her A&D issues.

31. The conditions that prevent the child's return to the mother's home are her failure to complete the most important steps on her permanency plan and failure to address her A&D issues.

32. The continuation of the parent and child relationship greatly diminishes the child's chance of an early integration into a stable and permanent home and therefore [Mother's] parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

In light of the particular circumstances of this case, we are not satisfied that clear and convincing evidence supports the trial court's reliance on persistent conditions as a ground for terminating Mother's parental rights. The trial court determined that Mother's addiction to pain medication was a condition that led to Destiny's removal in March 2014 and still persisted at the time of the termination hearing in October 2015. In large part, its finding was based on Mother's noncompliance with the permanency plan requirements aimed at addressing her addiction issues. While Mother's failure to complete those requirements was sufficient to support termination of her parental rights for substantial noncompliance with the permanency plan, it did not relieve DCS of its burden to prove that the condition still persisted by clear and convincing evidence.

Under different circumstances, Mother's failure to seek treatment between the time of removal and the termination hearing might well have supported a finding of persistent conditions. We cannot overlook, however, that Mother's efforts to stop using pain medication, whatever they may have been, were severely disrupted in this case by her arm injury and the three surgeries that followed. Mother was prescribed pain medication by her treating doctor after the injury and after each surgery, and she testified that her last

- 15 -

prescription ended just three weeks before the termination hearing. As a result, her progress in overcoming the addiction issues that led to Destiny's removal was not clear at the time of the hearing. While Mother testified that she had been drug-free in the weeks preceding the hearing, a determination that she had overcome her addiction at that point would have been highly speculative given her history of relapse. Conversely, however, because Mother was prescribed pain medication for a majority of time between Destiny's removal and the termination hearing,[7] it was not clear that she would continue to use it unnecessarily in the future. While we share the trial court's concern that there is little evidence of Mother's efforts to overcome her addiction to pain medication, given the peculiar circumstances of this case, we are not satisfied that the record contains sufficient evidence that it still persisted at the time of the termination hearing. As such, we hold that the trial court's reliance on persistent conditions as a ground for terminating Mother's parental rights was not supported by clear and convincing evidence.

### 3. Severe Child Abuse

The trial court relied on its finding of severe child abuse as a ground for termination. In Tennessee, a court may terminate parental rights when "[t]he parent or guardian . . . is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against the child who is the subject of the petition." Tenn. Code Ann. § 36-1-113(g)(4). For purposes of parental termination, "severe child abuse" is defined in relevant part as:

> The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death.

Tenn. Code Ann. § 37-1-102(b)(21)(A)(i).

The trial court made the following findings with regard to the ground of severe child abuse:

> 33. [Mother] has committed severe child abuse as defined by Tenn. Code Ann. § 37-1-102(21) against [Destiny], who is the subject of this Petition. The Respondent's actions that constitute severe child abuse were to drive an

---

[7] The record reflects that Destiny was removed from the Mother's home by DCS on March 27, 2014. Mother was on legally prescribed pain medication from October 2014 to September 2015, about three weeks prior to the termination proceeding.

automobile while under the influence of intoxicants and with the child unrestrained in the vehicle placing the child at imminent risk of serious bodily harm or death.

34. Trooper Jeff Brown testified at trial that mother was found to be driving erratically and that [Destiny] was in the back seat of the vehicle unrestrained without an appropriate car seat even present in the vehicle.

35. Mother was also found in possession of Morphine and Xanax which were not prescribed to her.

36. Mother was charged at that time with DUI and reckless endangerment and mother pled guilty to both of these charges.

37. Therefore the Department has proven that mother has committed severe abuse of this child and her parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(4).

In our view, the evidence in the record is insufficient to support the trial court's findings of severe child abuse by Mother under the particular circumstances of this case. As its order reflects, the trial court's finding of severe child abuse is based solely on Mother's arrest for DUI and reckless endangerment. Certainly, Mother's decision to operate a vehicle under the influence of intoxicants with her child unrestrained in the back seat is abhorrent and inexcusable. However, DCS workers discussed the incident with Mother approximately one week after her arrest and decided that court action was not necessary at that time. Additionally, when the trial court adjudicated the children dependent and neglected following Mother's subsequent failed drug screen, it concluded that "the children's safety can be adequately protect[ed] with the children remaining in the mother's home" and declined to make a finding of severe child abuse despite DCS's request that it do so. While we do not wish to belittle the seriousness of Mother's actions, the trial court's decision to make a finding of severe child abuse in the termination proceedings when it declined the opportunity to do so based on the same facts in the dependency and neglect proceedings appears to this Court to be incongruous. As such, we hold that the trial court's termination of Mother's parental rights based on severe child abuse was not supported by clear and convincing evidence.

Although we have concluded that two of the three statutory grounds relied on by the trial court in terminating Mother's parental rights were not supported by clear and convincing evidence, DCS was only required to prove the existence of one of the statutory grounds in order to terminate Mother's parental rights. Tenn. Code Ann. § 36-1-113(c)(1); *In re*

*Valentine*, 79 S.W.3d at 546.  Because we have concluded that the trial court's finding of substantial noncompliance was supported by clear and convincing evidence, we proceed with our review of whether terminating Mother's parental rights was in Destiny's best interest.

## V. BEST INTERESTS

When at least one of the statutory grounds for termination of parental rights has been established by clear and convincing evidence, the petitioner must prove by clear and convincing evidence that termination of the parent's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *In re Angela E.*, 303 S.W.3d at 251.  Once the court has determined that the parent is unfit based on clear and convincing evidence that one or more of the grounds for termination exists, the interests of the parent and child diverge, and the interests of the child become the court's paramount consideration.  *In re Audrey S.*, 182 S.W.3d at 877.  Because not all parental misconduct is irredeemable, the statutes governing termination of parental rights in Tennessee recognize that terminating the parental rights of an unfit parent will not always serve the best interests of the child.  *Id.*  If the interests of the parent and the child conflict, however, the court must always resolve the conflict in favor of the rights and best interests of the child.  Tenn. Code Ann. § 36-1-101(d).

Tennessee Code Annotated section 36-1-113(i) sets forth a list of factors to be considered when determining a child's best interests in a termination of parental rights case. Although courts should consider the statutory factors to the extent that they are relevant to the particular facts and circumstances of the case, the list is "not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667.  Depending on the circumstances of the case, the consideration of a single factor, or of facts outside the statutory factors, may dictate the outcome of the court's analysis.  *In re Audrey S.*, 182 S.W.3d at 878.

Here, the trial court made the following best interest findings:

1.   [Mother] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent.

2.   While the Court agrees that the mother has made some improvements in her situation very recently (and after the filing of the Petition for Termination), the Court finds that these improvements are simply too late and the best interest analysis must be made from the viewpoint of the child.

3. [Mother] has committed brutality, physical, sexual, emotional or psychological abuse or neglect toward other child in the family or household.

4. Mother admitted at trial that her drug use has resulted in her loss of the custody of all three of her children.

5. [Mother's] use of alcohol or controlled substances renders her consistently unable to care for the child [in] a safe and stable manner.

6. Mother testified in Court that she was no longer taking any narcotic medication but her most recent hair follicle drug screen was positive for narcotics and mother never provided proof of any prescription.

7. Mother has known since the inception of the case that an A&D assessment would be necessary, yet she has consistently declined to submit to the assessment.

8. Mother has known since the inception of the case that random drug screens would be required but told her caseworker that her attorney told her not to take them.

9. Mother admitted at trial that her attorney did not give her this advice.

10. [Mother's] emotional status would be detrimental to the child and/or prevent her from effectively providing safe and stable care and supervision for the child.

11. Mother testified at trial that she was attending mental health treatment, but admitted that she had only recently begun this treatment (after the Petition for Termination was filed) and had not notified the Department that she was attending so that the records could be requested until the month before trial.

12. [Mother] has not paid child support consistently with the child support guidelines promulgated by the Department pursuant to Tenn. Code Ann. § 36-5-101.

13. The Court is not limited to considering the factors set out in Tenn. Code Ann. §§ 36-1-113(i) 1-9 and also considers the following factors in determining whether termination of parental rights is in the best interest or the child.

- 19 -

14. [Mother] has not paid a reasonable portion of the child's substitute physical care and maintenance when financially able to do so.

15. Mother has not provided a significant amount of food, clothing, diapers, toiletries, school supplies, books, toys, etc. for the child, despite her testimony that she has had steady income for over a year.

16. [Mother] continues to make lifestyle choices that prevent her from being able to parent the child or to provide a home for the child by still failing to address the issues that led to removal — namely her A&D issues.

17. The child is placed in a foster home that wishes to adopt the child.

18. The child has established a strong bond with the foster parents.

19. The child needs to be released from the stigma of being a foster child.

Mother contends that DCS's lack of reasonable efforts to assist her is determinative of the best interest inquiry in this case. She argues that DCS's efforts to assist her in remedying the conditions that led to Destiny's removal fell so far below acceptable standards that termination of her parental rights is not in Destiny's best interest. In support of this argument, she points to numerous alleged deficiencies in the services provided by DCS in this case. She points out that five different caseworkers were assigned to her since DCS first became involved with the family in April 2013. She asserts that the lack of consistency made it difficult to establish substantive relationships and maintain regular communication. Additionally, she maintains that the caseworkers failed to provide meaningful assistance to her throughout the case. She points to Ms. Seals's testimony that the efforts of one caseworker were not sufficient and that the delays in getting permanency plans ratified were unreasonable and inexcusable. She also points to Ms. Deason's testimony that she could have done more to assist Mother in completing her permanency requirements. She argues that caseworkers provided little assistance to her beyond offering rides, administering drug tests, and being available to answer questions after the children were removed from her custody. In light of those alleged deficiencies, Mother contends that the lack of reasonable efforts weighs so heavily in this case that termination of her parental rights was not in Destiny's best interest.

We are not persuaded by Mother's argument. While the record reflects that DCS assistance in this case was far from ideal, it does not outweigh the clear and convincing evidence that terminating Mother's parental rights is in Destiny's best interest. Prior to their

removal, Mother was unable to provide her children with a safe and stable home. In April 2013, she was arrested for driving under the influence of intoxicants with Destiny unrestrained in the car. Despite the fact that her addiction was clearly a threat to the children's safety, Mother was given the opportunity to attend treatment and retain custody of them but relapsed twice and continued abusing pain medication. In March 2014, a DCS caseworker visited Mother's home and reported that it was "cluttered, dirty, and unsanitary." The children had head lice and went to school hungry and without weather-appropriate clothing.

Although Mother admitted that the children's best interest was served by their removal in March 2014, she argues that she has made significant improvements since that time. At the time of the hearing, Mother was working and living in an appropriate two-bedroom apartment. She had reconnected with an aunt who testified that she would provide support for Destiny. Additionally, according to her own testimony, she had not taken pain medication in the three weeks since finishing treatment for her arm injury. While we commend Mother for those efforts, her progress is somewhat speculative. For the majority of the case, Mother failed to keep DCS apprised of her living arrangements, reporting only that she was staying with a friend or family member without providing a specific address. Although she moved into an appropriate apartment roughly a month before the hearing, she does not have a lease and lives there on a month-to-month basis. Thus, it is unclear the extent to which Mother's living arrangement at the time of the hearing can be considered stable. Likewise, we cannot overlook that Mother was given multiple opportunities to stop using pain medication and retain custody of her children at the outset of this case and, despite undergoing treatment for her addiction, relapsed twice. After her arm injury, DCS efforts to monitor Mother's use of prescription pain medication were thwarted by her failure to comply with permanency requirements. Moreover, despite testifying that she had been off the medication for three weeks at the time of the hearing, Mother still had not made any effort to undergo an alcohol and drug assessment. As such, her claim of having overcome her addiction and being drug-free was supported only by her own testimony.

Meanwhile, the record reflects that Destiny has been residing in a loving foster home since she was removed from Mother's custody. Her foster mother testified that Destiny has a strong bond with her family and that they wish to adopt her. She is involved in extracurricular activities and receives the medical attention and resources she needs to thrive. In our view, Destiny's best interests would not be served by removing her from the stable and nurturing environment she now enjoys. This is particularly the case when Mother's ability to meet the child's long-term needs is speculative at best. We are therefore satisfied that clear and convincing evidence supports the trial court's finding that termination is in Destiny's best interest.

## VI. RULE 33.03

Finally, we address Mother's contention that the trial court erred in denying her motion for DCS to be required to provide specific answers to her interrogatories rather than copies of their business records under Tennessee Rule of Civil Procedure 33.03. Rule 33.03 allows a party served with interrogatories to forgo providing a comprehensive written response in certain circumstances. The rule provides that if the answer to an interrogatory may be ascertained from the responding party's business records, and the burden of ascertaining the answer is substantially the same for each party, the party served may respond to the interrogatory by producing the relevant records and allowing the interrogating party a reasonable opportunity to review them. Tenn. R. Civ. P. 33.03.

Mother argues that the trial court abused its discretion in denying her motion because DCS failed to demonstrate that the answers to her interrogatory could be derived from the business records it provided and failed to specify the records in sufficient detail. However, the interrogatory in question is not included in the record on appeal nor has Mother identified the records DCS produced in response to it. As the appellant, Mother had a duty to prepare a record that conveyed a fair, accurate, and complete account of what transpired in the trial court in order to allow meaningful review on appeal. *Jennings v. Sewell-Allen Piggly Wiggly*, 173 S.W.3d 710, 713 (Tenn. 2005); *see also* Tenn. R. App. P. 24(a). Because the record does not contain the relevant documents, we cannot consider this issue.

## VII. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court to terminate Jennifer D.'s parental rights as to Destiny S. Costs of this appeal are taxed to the appellant, Jennifer D. Because Jennifer D. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
ARNOLD B. GOLDIN, JUDGE